# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF NORTH CAROLINA
# RALEIGH DIVISION

IN RE:

BUNN COMMUNICATIONS, INC.,         CASE NO. 16-03291-5-DMW
                                   CHAPTER 11
　　　　DEBTOR.

## MOTION TO REOPEN CHAPTER 11 BANKRUPTCY CASE

**NOW COMES** the Debtor BUNN COMMUNICATIONS, INC. (collectively, "Debtor"), by and through undersigned counsel of record, and pursuant to §§ 105(a) and 350(b) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 5010,[1] hereby moves this Court for an Order reopening the above-captioned chapter 11 case for the purpose of enforcing the Order Confirming Plan of Reorganization [D.E. 143] (the "Confirmation Order"), which confirmed and approved the Plan of Reorganization [D.E. 85] proposed by the Debtor, as amended and modified, the Order Allowing Motion for Approval of Settlement and Compromise [D.E. 113], and applicable provisions of the Bankruptcy Code and North Carolina law, which collectively granted the Debtor and related parties substantive rights, and rectifying the willful and systematic actions taken by certain creditors in violation thereof. In support hereof, the Debtor shows unto the Court as follows:

1.　　This Court has jurisdiction over the relief sought by the Debtor pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2); see In re Kiker, 98 B.R. 103, 103-04 (Bankr. N.D. Ga. 1988) (holding that a debtor's motion to reopen a bankruptcy case to enforce the discharge injunction provided by, *inter alia*, §

---

[1] All statutory and rule references, unless otherwise indicated herein, are to the Bankruptcy Code, 11 U.S.C. § 101 et seq. and the Federal Rules of Bankruptcy Procedure, respectively.

524 of the Bankruptcy Code, is a core proceeding). Likewise, this Court has the authority to hear this matter pursuant to General Order of Reference entered by the United States District Court for the Eastern District of North Carolina on August 3, 1984. The predicates for the relief requested herein are §§ 105 and 350(b) as well as Rule 5010 of the Federal Rules of Bankruptcy Procedure.

2. The Debtor, a corporation formed and existing under the laws of the State of North Carolina, filed a voluntary petition seeking relief under chapter 11 of the Bankruptcy Code on June 22, 2016 (the "Petition Date"), Case No. 16-03291-5-DMW, in the United States Bankruptcy Court for the Eastern District of North Carolina (the "Bankruptcy Court") (collectively, the "Bankruptcy Case").

3. At all times relevant hereunder, Joe Larry Bunn ("Mr. Bunn") and Pamela S. Bunn ("Mrs. Bunn") (collectively, the "Bunns"), were the sole officers and shareholders of the Debtor.

4. Prior to the Petition Date, the Debtor executed a Business Loan Agreement with Celtic Bank Corporation ("Celtic Bank"), memorializing the extension of credit to Debtor (the "Business Loan Agreement") pursuant to a U.S. Small Business Administration Note in the original principal amount of $150,000.00, with interest accruing at a variable rate equal to 6.25% (the "SBA Note" or the "Note"), and payable in monthly installment payments of principal and interest in the amount of $1,665.86, with a final payment of all outstanding principal and interest due on or before the May 15, 2024. Repayment of the Note was secured by a Commercial Security Agreement executed by the Debtor (the "SBA Security Agreement" or the "Security Agreement"), which granted Celtic Bank a security interest in all equipment, trade fixtures, inventory, instruments, accounts, chattel paper, general intangible, whether then owned or thereafter acquired, and all accessions, additions, replacements, substitutions, and proceeds relating to the foregoing (the "Collateral"), which was perfected by the filing of a UCC Financing Statement

with the North Carolina Secretary of State on May 16, 2014, File No. 20140046689A, relating to the Collateral (the "Financing Statement").

5.      In connection with the transaction, the Bunns each executed an Unconditional Guarantee dated May 15, 2014 (collectively, the "SBA Guaranty Agreements" or the "Guaranty Agreements") (the Business Loan Agreement, the Note, the Security Agreement, the Financing Statement, and the Guaranty Agreements are collectively referred to herein as, the "SBA Loan Documents" or the "Loan Documents" and, with respect to the transaction as a whole as, the "SBA Loan" or the "Loan"), under which they guaranteed repayment and performance of the Debtor's obligations under the Business Loan Agreement and the Note.

6.      Celtic Bank, in the Bankruptcy Case, filed a proof of claim, Claim No. 10, as amended, asserting a secured claim against the Debtor in the amount of $125,780.84, as of the Petition Date, and arising from the Loan (the "POC").

7.      Post-petition, and in connection with resolution of a dispute that arose with Celtic Bank in the Bankruptcy Case, the Debtor and Celtic Bank executed a Settlement Agreement and Mutual Release Agreement (the "Settlement Agreement"), which was approved by the Bankruptcy Court pursuant to the Order Allowing Motion for Approval of Settlement and Compromise [D.E. 113] (the "Settlement Order") entered on November 9, 2016.

8.      The Settlement Agreement contained the provisions, the cumulative effect of which released, discharged, and terminated any liability of the Debtor and its principals, the Bunns, for the outstanding balance of the Loan, including any liability arising under—and by virtue of—the Guaranty Agreements.

9.      On January 18, 2017, and after a hearing conducted in the Bankruptcy Case on December 13, 2016 (the "Confirmation Hearing"), the Bankruptcy Court entered an Order

Confirming Plan of Reorganization [D.E. 143] (the "Confirmation Order"), which confirmed and approved the Plan of Reorganization [D.E. 85] proposed by the Debtor, as amended and modified (the "Plan") (the Plan and the Confirmation Order are collectively referred to herein as, the "Confirmed Plan"), containing the following impaired treatment of the Loan:

> This obligation shall be treated as a General Unsecured Claim in Class 22 below based on, *inter alia*, the value of the Celtic Bank Collateral, which is subject to liens and encumbrances senior to those of Celtic Bank, is not sufficient to support a finding that any portion of the Celtic Bank Loan is secured, pursuant to § 506 of the Bankruptcy Code. Celtic Bank, within thirty (30) days of the Effective Date, shall mark the Celtic Bank Financing Statement as "CANCELLED" as of the Effective Date and have it erased and/or removed from the North Carolina Secretary of State and the public record.

10. Article XIII of the Confirmed Plan, entitled "Effect of Confirmation," provided in relevant part, as follows:

> D. <u>Injunction.</u> As of the Confirmation Date, except as otherwise provided in the Plan or the Confirmation Order, all persons that have held, currently hold, or may hold a Claim, Equity Interest, or other debt or liability that is treated pursuant to the terms of the Plan or that is otherwise enjoined pursuant to § 1141 of the Bankruptcy Code, are enjoined from taking any of the following actions against the Debtor on account of any such Claims, Equity Interests, debtor or liabilities, other than actions brought to enforce obligations under the Plan: (i) commencing or continuing in any manner any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting, or enforcing any lien or encumbrance; (iv) asserting a setoff or right of recoupment of any kind against any debt, liability, or obligation; and/or (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order. Notwithstanding the foregoing, the Plan does not release or waive any Claims the Debtor may have against any party in interest.

Order Confirming Plan of Reorganization [D.E. 143], Ex. A, art. XIII(D). Article XV of the Confirmed Plan entitled, "Miscellaneous Provisions," provided that "the holders of claims . . . shall, upon reasonable request, execute and deliver any and all documents and assurance, and do all things necessary or appropriate to carry out fully the provisions hereof." Id. art. XV(C).

11. The Effective Date of the Confirmed Plan was February 1, 2017 (the "Effective Date"), which is the fourteenth (14th) day following entry of the Confirmation Order.

12. After the Effective Date, and on at least two (2) separate occasions, demanded in writing that Celtic Bank cancel and terminate the Financing Statement of record with the North Carolina Secretary of State in accordance with the provisions of the Confirmed Plan. These written requests and demands for Celtic Bank to comply with the terms and provisions of the Confirmed Plan were, however, ignored.

13. On December 31, 2018, and with the knowledge that the Confirmed Plan required and compelled it to cancel and terminate the Financing Statement, Celtic Bank filed a UCC Financing Statement Amendment (Form UCC3) with the North Carolina Secretary of State, File No. 20180131186B (the "Continuation Statement") continuing—as opposed to cancelling or terminating—the attachment of its security interest in the Collateral and effectiveness of the Financing Statement.

14. Following the Effective Date, and upon information and belief, all right, title, and interest in the Loan was assigned and/or transferred, in whole or in part, by Celtic Bank to the UNITED STATES SMALL BUSINESS ADMINISTRATION (the "SBA") which, in turn, referred it to the BUREAU OF FISCAL SERVICES, an agency of the UNITED STATES DEPARTMENT OF THE TREASURY (the "BFS"), for collection.

15. Despite releasing and terminating any and all liability of the Debtor and the Bunns for payment of any portion of the outstanding balance of the Loan, pursuant to the terms of the Settlement Agreement and accompanying Settlement Order, the SBA and its agents, including the BFS and a third-party collection agency, TRANSWORLD SYSTEMS, INC. ("TSI") began aggressively pursuing collection of the Loan from, inter alia, the Debtor and the Bunns,

individually.

16.     Following the closing of the Bankruptcy Case, Celtic Bank, the SBA, and BFS have engaged in a pattern of conduct demonstrating a blatant and willful disregard for the terms of the Confirmed Plan, the Confirmation Order, the Settlement Order, and applicable provisions of the Bankruptcy Code and North Carolina law.

17.     Specifically, and with respect to the Bunns individually, the SBA and its agents, including the BFS, has and continues to offset, seize, and apply towards the outstanding balance of the Loan portions of the monthly benefits that the Bunns receive from the Social Security Administration (the "SSA Benefits"). Specifically, and in violation of the Settlement Agreement and the Settlement Order, which released and discharged any and all liability for repayment of the Loan, and applicable law, the following SSA Benefits have been intercepted and seized by the SBA and/or BFS, and applied to the Loan:

| Month | Joe Larry Bunn | Pamela S. Bunn | Total |
|---|---|---|---|
| September 2022 | $0.00 | $313.20 | $313.20 |
| October 2022 | $392.45 | $313.20 | $705.65 |
| November 2022 | $392.45 | $313.20 | $705.65 |
| December 2022 | $392.45 | $313.20 | $705.65 |
| January 2023 | $429.30 | $343.17 | $772.47 |
| February 2023 | $429.30 | $343.17 | $772.47 |
| March 2023 | $429.30 | $343.17 | $772.47 |

18.     The Debtor and the Bunns, through counsel, have repeatedly requested that all collection efforts relating to the Loan cease, including but not limited to, termination of the offset and seizure of the SSA Benefits by the SBA and the BFS. Those requests have been ignored and, with knowledge that their actions are prohibited by the terms of the Confirmed Plan, the Confirmation Order, the Settlement Agreement, the Settlement Order, and the provisions of the Bankruptcy Code, they have continued to pursue collection of the Loan in an unlawful manner from the Debtor and its principals, the Bunns.

19. Following the closing of the Bankruptcy Case, Celtic Bank, the SBA, and BFS have engaged in a pattern of conduct demonstrating a blatant and willful disregard for the terms of the Confirmed Plan, the Confirmation Order, the Settlement Order, and applicable provisions of the Bankruptcy Code and North Carolina law.

20. Notwithstanding the foregoing, and the substantive rights bestowed and protections afforded through the Bankruptcy Case, the Debtor—and its principals—have been the victims of the failure by Celtic Bank, the SBA, the BFS, and TSI, to comply with the terms and conditions of the Confirmed Plan, the Confirmation Order, the Settlement Order, the Settlement Agreement, and applicable provisions of the Bankruptcy Code, which have caused significant injuries and damages, including the incurrence of attorneys' fees, costs, and expenses.

21. Section 105(a) of the Bankruptcy Code provides bankruptcy courts with broad discretion to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a); see In re Baldwin-United Corp. Litig., 765 F.2d 343, 348 (2d Cir. 1985) (recognizing that the bankruptcy court's authority under § 105 is broader than the provisions of the automatic stay under § 362). Section 350(b), in turn, provides that "[a] case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause." 11 U.S.C. § 350(b); see Fed. R. Bankr. P. 5010 (stating that "[a] case may be reopened on motion of the debtor or other party in interest pursuant to § 350(b) of the Code."). One of the "other causes" recognized for reopening a case under § 350(b) is the need to enforce a discharge injunction. See, e.g., Redmond v. Fifth Third Bank, 624 F.3d 793, 798 (7th Cir. 2010) ("A bankruptcy court may, for example, reopen a case for the correction of errors, amendments necessitated by unanticipated events that frustrate a plan's implementation, and the need to enforce the plan and discharge." (citing In re Zurn, 290 F.3d 861, 864 (7th Cir.

7

2002)). To grant a motion to reopen "[t]he moving party must demonstrate that there is a compelling cause. There is no cause if reopening would serve no purpose." Horizon Aviation of Va., Inc. v. Alexander, 296 B.R. 380, 382 (E.D. Va. 2003) (holding that "[t]here is no cause if reopening would serve no purpose.").

22.     The determination of whether a movant has demonstrated sufficient cause under § 350(b) is within the broad discretion of the Court and is based "upon the circumstances of the case." Hawkins v. Landmark Finance Co., 727 F.2d 324, 326-27 (4th Cir. 1984); accord In re Case, 937 F.2d 1014, 1018 (5th Cir. 1991) ("This discretion depends upon the circumstances of the individual case and accords with the equitable nature of all bankruptcy proceedings.").

23.     The statutory text of § 350(b) specifically authorizes bankruptcy courts to reopen bankruptcy cases to consider affording relief provided under the Bankruptcy Code, "particularly if that right is grounded in a prior order of the court." In re Venuto, 343 B.R. 120, 125 (Bankr. E.D. Pa. 2006) (citations omitted); see In re Coastline Care, Inc., 299 B.R. 373, 377 (Bankr. E.D.N.C. 2003) ("It follows that there is no reason to grant a motion to reopen if substantive relief cannot be granted independently in the reopened case."). In determining whether reopen a case, bankruptcy courts may consider a number of nonexclusive factors including, *inter alia*, "(1) the length of time that the case has been closed; (2) whether the debtor would be entitled to relief if the case were reopened; and (3) the availability of nonbankruptcy courts, such as state courts, to entertain the claims." Redmond, 624 F.3d at 798 (citing In re Antonious, 373 B.R. 400, 405-06 (Bankr. E.D. Pa. 2007)). Additional factors generally considered when determining whether to reopen a previously-closed bankruptcy case, include:

> [T]he length of time that the case was closed . . .; whether a non-bankruptcy forum, such as state court, has the ability to determine the issue sought to be posed by the debtor . . .; whether prior litigation in bankruptcy court implicitly determined that the state court would be the appropriate forum to determine the rights, post

8

bankruptcy, of the parties; whether any parties would be prejudiced were the case reopened or not reopened; the extent of the benefit which the debtor seeks to achieve by reopening; and whether it is clear at the outset that the debtor would not be entitled to any relief after the case were reopened.

In re Otto, 311 B.R. 43, 47 (Bankr. E.D. Pa. 2004) (citations omitted); In re Carter, 38 B.R. 636, 638 (Bankr. D. Conn. 1984).

24. Application of the foregoing factors warrant the reopening of the Bankruptcy Case. As previously mentioned, following the closure of the Bankruptcy Case, the Debtor and its principals have been, and will continually be, the victims of the willful, intentional, knowing and systematic conduct and violations of the Confirmed Plan, the Confirmation Order, the Settlement Agreement, and the Settlement Order (all of which are binding upon the SBA, the BFS, TSI, and Celtic Bank), the Bankruptcy Code, and other applicable federal and North Carolina law, by engaging in a pattern of conduct and undertaking actions, the purpose of which is aimed at collecting the outstanding balances and amounts that Debtor and its principals, the Bunns, are not legally required to pay under the Loan as modified by the Confirmed Plan, the Settlement Agreement, and the Settlement Order.

25. Accordingly, and based upon the foregoing, the Debtor seeks entry of an Order reopening the Bankruptcy Case to enforce compliance with the Confirmed Plan, Confirmation Order, the Settlement Order, the provisions of the Bankruptcy Code, as well as other applicable federal and North Carolina law, and remedying all of the systematic and continuous violations thereof.

26. Because of the egregious nature of the violations at issue and the gravity of the relief and remedies requested, the Debtor requests that the reopening fee imposed by 28 U.S.C. § 1930, be waived. See Bankruptcy Court Miscellaneous Fee Schedule ("The reopening fee ***must not be charged*** . . . when a debtor files a motion to reopen a case based upon an alleged violation

of the terms of a discharge under 11 U.S.C. § 524[.]" (emphasis added)).

27.     Based on the foregoing, the Debtor has demonstrated sufficient cause under § 350(b) to reopen the Bankruptcy Case.

**WHEREFORE,** for the foregoing reasons, the Debtor respectfully requests that the *Motion to Reopen Chapter 11 Bankruptcy Case* be **ALLOWED** and entry of an Order providing the following relief:

1.      Reopening the above-captioned chapter 11 case, Case No. 16-03291-5-DMW, pursuant to § 350(b) and Fed. R. Bankr. P. 5010;

2.      Waiving the reopening fee imposed by the Bankruptcy Court Miscellaneous Fee Schedule and associated with reopening the Bankruptcy Case;

3.      Waving any requirement that the Debtor file any post-confirmation reports required by Fed. R. Bankr. P. 2015; and

4.      Allowing such other and further relief as the Court may seem just and proper.

Respectfully submitted this, the 23rd day of March, 2023.

**BUCKMILLER, BOYETTE & FROST, PLLC**

BY:   s/Joseph Z. Frost

JOSEPH Z. FROST, NCSB No. 44387
jfrost@bbflawfirm.com

4700 Six Forks Road, Suite 150
Raleigh, North Carolina 27609
T: 919-296-5040
F: 919-977-7101

Counsel for Debtor Bunn Communications, Inc.